

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Marshall Bishop, <br><br> Plaintiff, <br><br> v. <br><br> DYNCORP INTERNATIONAL INC. <br><br> Defendant. | **FILED UNDER SEAL** <br><br> **DO NOT PLACE ON PACER** <br><br> CIVIL ACTION NO. *1: 14cv47 TSE/TRJ* <br><br> **JURY TRIAL DEMANDED** |

**RELATOR'S COMPLAINT PURSUANT TO**
**THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *ET SEQ.***

The relator Marshall Bishop (herein after "Relator" or "Bishop"), on behalf of the United States of America, brings this action against DynCorp International, Inc.("DynCorp" or "Defendant") for violations of the Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*

## I.    INTRODUCTION

1.    The FCA, which was enacted during the Civil War to combat rampant fraud in defense contracting, prohibits a person from knowingly submitting or causing the submission of false or fraudulent claims for payment or approval to the United States or the making of false statements material to a false or fraudulent claim. Claims requesting payment for goods or services that do not satisfy all material conditions of payment established in a contract are "false claims" under the FCA.

2.    The FCA provides for any person who knowingly submits a false or fraudulent claim to the Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government, including attorneys' fees. The FCA allows any person having information regarding a false or fraudulent claim against the Government to bring a private cause of action for himself and on

behalf of the Government and to share in any recovery. The complaint is to be filed under seal for sixty days (without service on the defendant during such sixty-day period) to enable the Government (a) to conduct its own investigation without the defendant's knowledge, and (b) to determine whether to join the action.

3.      Based on these provisions, Relator, seeks to recover on behalf of the United States damages and civil penalties arising from false and fraudulent claims for payment or approval that Defendant submitted, or caused to be submitted, to the Department of State ("DOS") in connection with the S-AQMPD-05-C-1103 contract, a multi-million dollar contract to provide support services, and making or using false statements or records to get false or fraudulent claims paid.   Relator also seeks to recover damages arising from the retaliatory termination of the Relator's employment in violation of 31 U.S.C. § 3730(h).

4.      More specifically, the Government contracted with DynCorp to provide maintenance services to aircraft that conformed to objectively verifiable government and industry safety standards.  DynCorp knowingly failed to provide services that conformed to those standards.  Notwithstanding its failures, DynCorp knowingly falsely represented to the United States that it had complied with these material contractual requirements and requested payment from the United States.  In short, DynCorp's conduct is the paradigmatic example of what the FCA was enacted during the Civil War to address – a defense contractor knowingly misrepresenting that it was providing conforming goods or services in support of the military mission when it was not. S. Rep. No. 345, 99th Cong. 2d Sess. at 9, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274 (the "most common" type of FCA case was "a claim for goods or services not provided, or provided in violation of contract terms.").

5. Relator has direct and independent knowledge of the following conduct that violated the False Claims Act: Defendant knowingly failed to comply with both Contract S-AQMPD-05-C-1103 and industry standards to maintain helicopters for the United States Department of State. Despite knowing that it had not complied with those contract standards, Defendant sought, and received payment from the United States Government.

6. DynCorp knowingly made false certifications that it had complied with those material requirements, by requesting payment under Contract S-AQMPD-05-C-1103 as if it had complied with material requirements for maintenance when it knew it had not complied. Its false representations were material to its receipt of payment and it would not have been paid in the amounts it received absent those representations, or had the United States been aware of its noncompliance with material provisions of Contract S-AQMPD-05-C-1103.

7. DynCorp's false statements, misrepresentations and omissions concerned conditions that were essential to the government's agreement to engage and pay DynCorp, and were critical to the United States Government.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction over this action under the Federal FCA pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3732(a) and 3730.

9. Venue is appropriate as to the Defendant in that the Defendant transacts business in this judicial district and maintains its corporate headquarters in this district located at 3190 Fairview Park Drive, Suite 700, Falls Church, Virginia 22042, and acts proscribed by 31 U.S.C. § 3729 have been committed by the Defendant in this judicial district. Therefore, venue is proper within the meaning of 28 U.S.C. § 1391(b) & (c), and 31 U.S.C. § 3732(a).

10.     To Relator's knowledge, this action is not barred by any provision of the Federal

False Claims Act.  In particular, the Federal FCA bars contained in 31 U.S.C. § 3730(e)(1) or (4)

do not apply to Relator:   there is no civil suit or administrative proceeding involving the

allegations and transactions herein to which the United States is a party, there has been no

statutorily defined "public disclosure" of these allegations or transactions or any allegations or

transactions that are substantially the same, and, in any event, Relator is an "original source"

within the meaning of the FCA.

## III.    THE PARTIES

11.     Relator, Marshall Bishop, is a citizen of the United States of America.  He was

employed by DynCorp from approximately August, 2009 to December, 2011.  He worked as a

Helicopter Sheet Metal Mechanic/Technician maintaining and repairing helicopters at the

Embassy Landing Zone Baghdad, Baghdad International Airport, Kirkuk, Tallil, and Basrah Iraq

until his employment was wrongfully and retaliatory terminated by DynCorp in December, 2011.

12.     DynCorp is a corporation organized pursuant to the laws of the State of Delaware,

with its principal place of business in the Commonwealth of Virginia, and is engaged in the

business of, *inter alia*, government service contracting, including maintenance services, as a

result of which DynCorp has received and continues to receive billions of dollars each year from

the United States.  DynCorp contracts are managed out of its office in Fort Worth, Texas.

## IV.    THE FALSE CLAIMS ACT

13.     The Federal False Claims Act provides, in pertinent part, that:

(a) Any person who (1) knowingly presents, or causes to be presented, to an
officer or employee of the United States Government or a member of the Armed
Forces of the United States a false or fraudulent claim for payment or approval;
(2) knowingly makes, uses, or causes to be made or used, a false record or
statement to get a false or fraudulent claim paid or approved by the Government;

[or] (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid ...

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....

31 U.S.C. § 3729.

14.    The FCA defines "knowingly" to include actual knowledge, deliberate ignorance, or reckless disregard, and no proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1).

15.    Claims requesting payment for goods or services that do not satisfy all material conditions of payment established in a contract are "false claims" under the FCA.  Materiality means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *United States ex rel. Berge v. Bd. of Trustees of Univ. of Ala.*, 104 F.3d 1453, 1460 (4th Cir. 1997); *see also* 31 U.S.C. § 3729(b)(4), *added by* Pub.L.No. 111-21, § 4(a), 123 Stat. 1621-22 (2009).

16.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, as amended by the Debt Collection Improvement Act of 1996, 28 U.S.C. § 2461 and 64 Fed. Reg. 47099, 47103 (1999), the False Claims Act civil penalties were adjusted to $5,500 to $11,000 for violations occurring on or after September 29, 1999.

V.    CONTRACT S-AQMPD-05-C-1103

17.    Based upon personal knowledge of the Relator throughout the course of his employment with Defendant, it is alleged that Defendant knowingly, unlawfully and wrongfully submitted false claims, records and statements to officials of the United States for the purpose of obtaining payments or approvals in connection with Contract S-AQMPD-05-C-1103 to perform various duties for the Office of Aviation within the U.S. Department of State.

5

18.     Defendant, DynCorp, originally contracted with the Department of State to provide a number of services to the United States pursuant to Contract S-AQMPD-05-C-1103. The Contract was awarded on or about May 6, 2005.  Upon information and belief that Contract has been extended and otherwise modified on several occasions since its original award date of May 6, 2005 (all modifications will be referred to herein as "Contract S-AQMPD-05-C-1103").

19.     Specifically, Contract S-AQMPD-05-C-1103 was contracted through the Bureau for International Narcotics and Law Enforcement Affairs Office of Aviation (INL/A) within the Department of State and was described as a general support services contract.  The INL/A is primarily responsible for supporting the U.S. Embassy Country Teams, generally through the Narcotics Affairs Section of each embassy, in their effort to assist host nation governments in the eradication and interdiction of illicit crops such marijuana, coca and opium poppy as mandated in the Foreign Assistance Act.

20.     The stated objectives of Contract S-AQMPD-05-C-1103 were to provide all necessary operations and support of INL/A missions for an initial transition period of up to six months, and a performance period that could extend 10 years provided the contractor meets performance incentives provided in the associated award term provision.  The anticipated annual contract value at the time of award, was approximately $170 million, but it was predicted that value could vary greatly depending upon how the mission evolves over the performance period. The total value of the initial award was believed to be $541,250,243 and was specified as an initial six month transition period plus a "base" year with two one year options to extend the contract.  Upon information and belief the Contract has been modified and/or extended and DynCorp continues to perform duties under Contract S-AQMPD-05-C-1103.

21. Specific program objectives for Contract S-AQMPD-05-C-1103 included illicit crop eradication, training, and most pertinent to the allegations contained herein: aircraft availability. DynCorp was required under the Contract to provide all necessary logistics and maintenance services to ensure that aircraft are available to perform the many tasks required by local U.S. Embassy Narcotics Affairs Section officials. The stated goal was to provide a lean logistics support system that uses state-of-the-art business practices and streamlined processes that minimize infrastructure requirements in all fields of operation.

22. In addition to the broadly described objectives above, Contract S-AQMPD-05-C-1103 states that all "other requirements of the Technical Requirements Document must be met. The government is interested in a best value approach that can provide all necessary services efficiently and safely. While there are inherent dangers in counter narcotics activities, every effort should be made to ensure that operations are conducted in accordance with proven industry and/or government standards."

23. DynCorp is subject to the Federal Acquisition Regulations ("FAR") and is also required to comply with a wide range of terms provisions, and representations set out in industry standards and, *inter alia*, the following: Standard Operating Procedures for DOS INL/A Aviation Operations in Iraq, INL/A Operations Directives, Iraq Supplement to the Operations Directives, Guide to Training and Standardization, Individual Aircraft Operator's Manuals, Approved Checklists and Aircrew Training Manual, and Iraq Standing Operating Procedures.

24. A primary indicator of contract performance is the fully mission capable ("FMC") rate (or aircraft readiness rate), a commonly used military term indicating the percentage of time that an aircraft (or any piece of equipment or training device) can perform all of its missions. During the relevant time period, DynCorp's contract with the government required an FMC rate

7

of 80%. More specifically, the contract states: "[DynCorp] is expected to establish the rating criteria to meet or exceed this [80%] rate."

25.    Contract S-AQMPD-05-C-1103 further states that the Government will approve an extension of the contract if DynCorp meets a set of criteria defined in a point system. Specifically, the Government "may only approve the use of an award term option year if the Contract for the applicable evaluation period earns a minimum score of 85 points out of 110 available points...." Twenty-two and a half percent (22.5%) of these points are based in part on "aircraft availability." DynCorp earned 86.5 points out of 100 points, because it received 21.2 out of 22.5 points, or an "excellent" rating for aircraft availability. Clearly, "aircraft availability", in addition to the other evaluation criteria including, meeting eradication goal, safety performance standards, other standards, discretionary matter, and costs, were material to the contract and extension of the contract.

## VI.    FACTUAL ALLEGATIONS

26.    Relator, Marshall Bishop, has spent 20 years of his working life inspecting aircraft and performing maintenance on aircraft.  In addition, Bishop has over 13 years of experience as a sheet metal mechanic on commercial and military aircraft.  Bishop's employment with Defendant included periods of time working in both Germany and Iraq.  Bishop began working for Defendant on or about August 17, 2009 as a Sheet Metal Mechanic/Technician in Iraq until his wrongful termination in December of 2011.

27.    Initially, Bishop's primary duties involved maintaining and inspecting MD 500 helicopters ("MD 500s") which are light utility civilian and military helicopters.

28.    Relator states that there were three MD 500s at the embassy.  Relator worked on these helicopters for approximately eight (8) months before he was transferred.  During this time,

Relator wrote up several cracks on the exhaust and on the anti-collusion light mountain plate. One month later, when Relator returned from training, he noticed that his write-ups for the cracks were signed off by one of the DynCorp mechanics indicating that the MD 500 was repaired. Because DynCorp indicated the cracks were repaired, they were no longer in the log book and DynCorp would not receive a Corrective Action Request and Report ("CARR") from the Department of State (if repairs were reported in the log book and parts needed were not ordered within forty-eight hours Department of State issues a CARR). Relator re-examined the aircraft and then wrote the cracks back up because they were not repaired. At this time, Relator also noticed that the DynCorp mechanics had indicated on form 2408-13-1 that the MD 500 had received an aircraft wash, when in fact it had not been completed. Relator states that the aircraft wash was necessary to keep dust and dirt from building and causing premature ware on the aircraft's components which would lead to more cost to the government.

29.     Relator informed DynCorp Quality Control, specifically a gentleman referred to as, "Frenchy," of the issues stated in the paragraph above. On or about June 15th, Relator then informed his country manager, Tony Sparks, that mechanics were "pencil wiping" the log books (*i.e.*, signing the log books indicating work was completed and repairs were made, but in fact, no repairs were completed). Tony Sparks immediately downed the aircraft and re-inspected them. Sparks then confiscated Relator's embassy badge, had Relator escorted to obtain his personal belongings and had Relator removed from the site and transferred to Baghdad International Airport ("Baghdad International"). Tony Sparks claimed that the reason for the removal was that Relator lacked necessary experience.

30.     At Baghdad International, Bishop's primary duties were performing inspections and maintenance on (ST) Bell "Huey" helicopters under Contract S-AQMPD-05-C-1103.

31.     Pursuant to applicable contractual standards and specifications and the applicable drawings, specifications and standard operating procedures required by Contract S-AQMPD-05-C-1103, Defendant DynCorp was required to provide maintenance on military helicopters.

32.     It became evident to Bishop immediately upon his hiring that the maintenance services being performed by DynCorp employees, at the direction of upper management, were not up to industry standards and more specifically were not being done to the standards and specifications outlined in Contract S-AQMPD-05-C-1103.

33.     Bishop immediately became aware through personal observation and direction from DynCorp Quality Control that the maintenance he was directed to perform, and witnessed other DynCorp employees perform, did not conform to industry standards nor did it comply with the Maintenance Standard Operating Procedures and Policy Guidelines manual that was part of Contract S-AQMPD-05-C-1103.

34.     For example, in or around June 2011, Relator was inspecting panels removed from an aircraft that was in for an engine change.  The aircraft had recently come out of a 300-hour inspection.  Upon inspecting the panels, Relator found over 150 discrepancies or cracks in the panels which were not reported/repaired.  Discrepancies are significant because any crack signifies that the part has been compromised and could lead to cracks in other parts and/or failure of a structure which could lead to catastrophic mishap.  Relator states that DynCorp is incentivized to not find discrepancies, because the more discrepancies found, the longer the aircraft would be down, which would result in more work for DynCorp and would not allow for an 80% FMC rate.

35.     DynCorp failed to comply with the specifications of Contract S-AQMPD-05-C-1103 and did so knowingly, wrongfully and fraudulently.  Over a period spanning approximately

10

six months beginning in July of 2011, Bishop informed Quality Control within DynCorp of the inadequate and unsafe maintenance procedures that he was directed to perform and that he witnessed other employees perform.

36.     On each such occasion, Bishop was told by superiors in Quality Control, in essence, not to worry about his complaints regarding the maintenance procedures, follow the orders given to him, and to get the helicopters out of his possession and in the air as quickly as possible with as little time spent on repairs as possible.

37.     For example, Bishop sent emails to his superiors and supervisors at DynCorp regarding the fraudulent maintenance procedures followed by DynCorp in Tallil, Iraq (Relator was based in Tallil, Iraq from August through December 2011). These emails are described below:

    a.     On or about September 13, 2011 Bishop informed his direct supervisor, David Talarczyk, regarding hazmat procedures that were not being properly followed at the Tallil, Iraq maintenance location. The lack of procedures resulted in a mix-up of substances.  Because of the mix-up the incorrect substance was used on the initial repair and the repair had to be redone.  Mr. Talarczyk let Bishop know he was doing a good job and encouraged him to bring similar issues to the attention of other supervisors in Quality Control.

    b.     On or about September 13, 2011 Bishop informed his direct supervisor, David Talarczyk, regarding the need for supplies for the Tallil location.  Specifically he was requesting a particular type of sheet metal as well as paint in order to carry out necessary repairs.  Bishop was provided none of the requested supplies and in fact was sent empty paint cans which were sent either as a joke or maliciously to prevent the

11

Tallil location from performing necessary repairs in accordance with Contract S-AQMPD-05-C-1103.

c.      On or about October 6, 2011, Relator inspected Aircraft 135132, a Huey. Relator states that the aircraft had several issues, including a gouge on the lift beam (lower R/H beam 205-030-845-201). According to industry standards it cannot be repaired, it needs to be completely removed and replaced, which would take a significant amount of time. Relator states that nicks, dents and damage that are no deeper than .003 inch can be polished, but that this damage was significantly deeper than .003 inch. Relator stated that he put aircraft 135132 on "RedX" status, meaning the aircraft was down and could not be flown. See a picture of the damage Relator describes to aircraft 135132 below:



d.      A DynCorp Quality Control Manager, Jody Goodwin, corresponded with Bishop regarding the types of repairs that are required per certain maintenance manuals. The communications centered on the repairs of an aircraft numbered

135132. Bishop informed Goodwin that the mechanics in Tallil had not been provided the appropriate maintenance and repair manual. Further, Bishop informed Goodwin that the orders he was being given by Quality Control in terms of what manual is appropriate and how to perform certain repairs on aircraft 135132 violated industry standards and directly violated the contract. DynCorp Quality Control Manager, Joe Carroll, confirmed that Bishop was correct regarding the repairs for aircraft 135132. However, Carroll stated that Quality Control did not require Bishop or other employees to repair per the manual and they were to get the aircraft repaired as quickly as possible and out of their possession.

e. Bishop refused to follow the directions of Quality Control and insisted on doing the repairs to aircraft 135132 per contract specifications. On or about November 19, 2011 a DynCorp sheet metal technician, Robert Harper, informed Bishop that the maintenance which he performed on aircraft 135132 that was the subject of paragraph c above angered his superiors. Harper informed Bishop that "Dave and Mike P. I guess came up with a fix and so it is done. Just a simple sandwich repair and that was it." Bishop contends that the repair here described to the lift beam of aircraft 135132 did not conform to any manual or industry standard and that the contract specifications required that the lift beam should have been replaced.

f. In order to get further clarification on what management and Quality Control expected from him, Bishop contacted Jeff Sands, the site manager. Sands explicitly told Bishop to stop doing such in depth repairs unless the repairs were "a safety of flight." Sands further instructed Bishop to repair the aircraft for flight, not attempt to repair the aircraft back to factory condition.

g.     Bishop again alerted superiors to what he believed to be illegal or non-conforming repairs and maintenance on aircraft 135132 in two emails he sent on or about December 9, 2011.  Bishop outlined the list of non-conforming repairs that Quality Control was not only aware of, but directly instructed maintenance personnel to perform.  Bishop reiterated the issues with repairing the lift beam to aircraft 135132 and Quality Control confirmed that there is no allowable damage to a lift beam, and therefore the "sandwich repair" described above was a non-conforming repair both to industry standards and Contract S-AQMPD-05-C-1103.  Further, Bishop stated that "the upper cargo door was repaired by cutting out damage and covering it with a piece of metal with no support."  This type of repair is also non-conforming to either industry standards or Contract S-AQMPD-05-C-1103.

h.     As a result of Bishop alerting his superiors to the nonconforming maintenance and repairs that DynCorp performed and systematically directed its employees to perform, Relator Bishop was unlawfully terminated from his employment with DynCorp in violation of 31 U.S.C.A § 3730(h).

38.     More specifically, in regard to the termination, subsequent to informing his superiors about the damage to the lift beam, Relator went on a thirty (30) day vacation and returned in or around December 4, 2011.  Upon returning from vacation, Relator noticed that Aircraft 135132 was flying because DynCorp had repaired the lift beam so they could take it off "RedX" status to maintain the 80% FMC rate.  Relator then informed Mike Peck that he was going to report DynCorp to the Department of State.

39.     Within twelve (12) hours after making this statement, on December 7, 2011, Relator was called into the office of the site manager, Mr. David Bratmiller, and was terminated.

When Relator returned to his room, after being terminated, he discovered that DynCorp denied him access to the computer and email system. Relator then called the Compliance hotline and Ms. Carla Micka and described the illegal maintenance performed on Aircraft 135132, as discussed above.

40.    Relator's e-mail messages to quality control officials described in the sub-paragraphs under paragraph 37 of this complaint and his statement to Mike Peck that he would report Dyncorp to the Department of State put Dyncorp on notice that relator was engaged in activity protected by the False Claims Act. Dyncorp's harassment and termination of Relator shortly after learning of this activity supports the inference that Relator suffered retaliation as a result of his actions to stop one or more violations of the False Claims Act.

## VII.    SUMMARY OF DEFENDANT'S FALSE CLAIMS ACT LIABILITY

41.    DynCorp certified that it complied with contractual requirements set forth in Contract S-AQMPD-05-C-1103 and/or industry standards when it presented claims for payment to the Department of State.

42.    Contrary to DynCorp's certifications, DynCorp did not comply with contractual requirements in that they knowingly performed repairs that did not conform with either Contract S-AQMPD-05-C-1103 and/or industry standards at all maintenance locations associated with Contract S-AQMPD-05-C-1103 in order to fraudulently maximize company profits.

43.    Additionally, DynCorp made material false representations to the Government that the repairs performed complied with Contract S-AQMPD-05-C-1103 and/or industry standards and consequently, have presented false claims for compensation to the Government.

44.     Tallil, Iraq was and is a secure location. There is no legal or rational reason as to why DynCorp directed its maintenance personnel to perform such emergency repairs outside of the specifications of Contract S-AQMPD-05-C-1103.

45.     In reliance on the above-described misrepresentations and false certifications in the claims for payment submitted by DynCorp to an officer or employee of the United States, the Government paid DynCorp.

46.     The false statements, omissions and fraudulent course of conduct were material to the Government's payment decisions under Contract S-AQMPD-05-C-1103.

47.     Additionally, because of DynCorp's actions, the government has been defrauded and Relator has been retaliated against for informing DynCorp of their fraudulent conduct and suffered a loss of his job, past and future income, economic benefits, and other compensatory damages.

## COUNT I
## FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. § 3729(a)(1) [1986], 31 U.S.C. § 3729(a)(1)(A) [2009]
### (Presenting A False Claim)

48.     Relator realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

49.     By virtue of the acts described above, the Defendant knowingly presented, or caused to be made or presented to the United States false or fraudulent claims for payment or approval.

50.     The United States was unaware of the foregoing circumstances and conduct of the Defendant and in reliance on said false and fraudulent claims authorized payments to be made to the Defendant and made such payments, and as a result, has been damaged.

51.     Such conduct constitutes a violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A).

**COUNT II**
**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729(a)(2) [1986], 31 U.S.C. §§ 3729(a)(1)(B) [2009]**
**(Knowingly Presenting A False or Fraudulent Record)**

52.     Relator realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

53.     By virtue of the acts described above, the Defendant knowingly made, used, or caused to be made or used false records or statements to get false or fraudulent claims paid or approved by the United States.

54.     The United States was unaware of the foregoing circumstances and conduct of the Defendant and in reliance on said false and fraudulent records authorized payments to be made to the Defendant and made such payments, and as result, has been damaged.

55.     Such conduct constitutes a violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

**COUNT III**
**31 U.S.C. § 3730(h)**
**(Retaliatory Discharge)**

56.     Relator realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

57.     In retaliation for lawful acts done by Marshall Bishop in furtherance of an action under the False Claims Act and because of other efforts by him to stop one or more violations of the False Claims Act, the Defendant discharged or attempted to discharge, demoted, threatened, harassed and/or discriminated against Marshall Bishop as to the terms and conditions of his employment.

17

58.   Such conduct constitutes a violation of the False Claims Act, 31 U.S.C. § 3730(h).

## REQUESTS FOR RELIEF

WHEREFORE, Relator, on behalf of the United States, demands that judgment be entered in his favor and against Defendant for the maximum amount of damages and such other relief as the Court may deem appropriate on each Count. This includes, with respect to the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Eleven Thousand Dollars ($11,000.00) and no less than Five Thousand Five Hundred Dollars ($5,500.00) for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.

Further, Relator requests that he be awarded damages as a result of Defendant's violation of 31 U.S.C. § 3730(h), including reinstatement and/or back pay, interest on the back pay, and compensation for all special damages sustained as a result of the retaliation.

Relator further requests that he receive the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States, plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that his award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated: January 16, 2014                                         Respectfully submitted,

Michael Nye, Esq.

CARTER & COLEMAN, PLC
Douglas Coleman, Esq.
dcoleman@cartercoleman.com

18

Michael Nye, Esq.
mnye@cartercoleman.com
602 Cameron Street
Alexandria, VA 22314
Tel: (703) 739-4200 x230
Fax: (703) 739-4210

BERGER & MONTAGUE, P.C.
Shauna B. Itri, Esq.
Daniel R. Miller, Esq.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3049
sitri@bm.net